DECISION.
{¶ 1} Defendant-appellant Jessie D. Collins appeals his convictions for endangering children[1] and felonious assault,[2] both second-degree felonies. A jury found that Collins had abused his two-month-old son, Jaevon, who suffered severe injuries to his brain, eyes, and legs from being shaken and struck. The trial court sentenced Collins to eight years in prison. We affirm.
 {¶ 2} In February 2003, Collins lived with his girlfriend, Jamie Tu, Tu's seven-year-old daughter, Monique, and Collins's and Tu's two children, two-year-old Elijah and two-month-old Jaevon. Tu worked thirty hours a week as a nurse's aide and attended school part-time.
 {¶ 3} On Monday, February 17, Collins, for the first time, took care of Jaevon while Tu went to work. On Tuesday, Tu was sick and did not go to work. But in the afternoon, she drove her sister on an errand, and Collins watched Jaevon for about an hour and a half to two hours. The next morning, Wednesday, February 19, Collins drove Tu to work and then took the two younger children to his mother's home. Collins's mother typically watched the children while Tu worked.
 {¶ 4} Around noon, Tu received a call from Collins's mother, who reported that Jaevon was making jerking movements and had a slight fever. Collins's mother told Tu that Jaevon had started making the jerking movements soon after he was left with her that morning. Collins's mother had tried to reach Collins, who was at home sleeping, but he had not answered the phone.
 {¶ 5} Tu was not sure if Jaevon was having seizures, so she called the Cincinnati Children's Hospital and made an appointment for 4:30 p.m. that day. The emergency-room nurse at Children's called Tu back around 2:00 p.m. and asked for the child's temperature. The nurse instructed Tu that if Jaevon's temperature remained elevated, she should take him straight to the emergency room.
 {¶ 6} Tu tried repeatedly throughout the afternoon to reach Collins, who had the family car. Collins was supposed to pick Tu up at 3:00 p.m. when she finished work, but Tu did not get in touch with Collins until 3:20 p.m. At that time, Collins headed to Tu's workplace, stopping to put air in one of the car's tires. After picking up the children, Collins and Tu headed to Children's Hospital, but they were involved in a minor traffic accident. No one in the car was injured. Finally, Tu and Collins got Jaevon to the hospital emergency room around 4:30 p.m.
 {¶ 7} While waiting in the emergency room, Jaevon woke up and his eyes started twitching. Tu told a nurse about the twitching. The nurse said that Jaevon was having a seizure, and Jaevon was immediately taken to a room and given an IV. The doctors also ordered x-rays and a CAT scan.
 {¶ 8} Dr. Marcus DeGraw, a pediatrician at Cincinnati Children's Hospital and a child-abuse fellow training with the child-abuse team at the hospital, testified that he treated Jaevon that day. According to DeGraw, Jaevon had two skull fractures, one on the side and one on the back of his head, that resulted in bleeding in the brain. Jaevon also had massive retinal hemorrhages in both eyes. In addition, both of Jaevon's legs were fractured immediately below his knees.
 {¶ 9} Tu and Collins were told about Jaevon's skull fractures first and then, later in the evening, were told that he had fractured legs and bleeding behind his eyes. Tu testified that she asked the doctor what could have caused the injuries, and the doctor answered that it could have been from the baby being shaken. Tu testified that Collins reacted to the news by asking who could have done that to Jaevon.
 {¶ 10} The next morning, Cincinnati police officers Greg Gehring and Brian Trotta were assigned to investigate Jaevon's injuries. Officers Gehring and Trotta went to Children's Hospital and spoke with Dr. DeGraw, who told them that the only explanation for Jaevon's injuries was shaken-baby syndrome. The officers then found Tu and Collins at the hospital and asked to speak to each of them at the police station. Tu and Collins both agreed, and the officers transported them separately to the station.
 {¶ 11} The officers interviewed Tu first and asked her if she had an explanation for Jaevon's injuries. Tu volunteered that, about a week before Jaevon was brought to the hospital, she had fallen asleep with him while on a couch, and he had rolled off her and onto the carpeted floor. The baby had given a startled cry, but had stopped crying and was fine when she comforted him.
 {¶ 12} Tu then gave a second possible explanation, telling the officers that, also about a week before Jaevon was brought to the hospital, he had been in a baby swing when it broke. One of the legs had collapsed and the swing fell to the side, but the baby did not fall out of the swing or hit anything.
 {¶ 13} Gehring testified that Tu then stated, "[T]he only person that could have done it was Jessie Collins." Tu related to the officer past incidents where Collins had gotten frustrated when Jaevon cried. Tu stated that when Jaevon would cry, Collins would get upset and yell. Tu stated that she would pick Jaevon up, and Collins would get upset with her and tell her that she was spoiling him. Gehring also testified that Tu told him that, on several occasions, Collins had thrown things and then left the apartment.
 {¶ 14} Tu also stated that two times she had seen Collins shake Jaevon when he was crying. According to Gehring, Tu said that Collins had shaken Jaevon while yelling, "[W]hat are you crying about boy? There's nothing wrong with you."
 {¶ 15} The officers gave Tu a doll and asked her to demonstrate on videotape what she had seen Collins say and do with Jaevon. The officers tried about three or four times to videotape Tu's recreation of Collins's interaction with the baby, but the video camera did not work. The officers finally found a functioning video camera and taped Tu's demonstration. Tu stated on the videotape, which was played for the jury, that she had seen Collins shake the baby two different times. The videotape then showed Tu holding the doll two different ways, each time shaking it and saying, "[W]hat are you crying about boy? There's nothing wrong with you."
 {¶ 16} The state introduced two letters written by Tu to Collins at the end of February or the beginning of March, while Collins was in jail awaiting trial for this case. Tu wrote, "I know these charges and accusations are harsh but I didn't try to put you away and I only told the truth for our son, I showed on tape exactly what I saw." Tu also wrote, "You can be mad for me telling the truth and I'm sorry but when it comes to our kids I had to tell the truth of our lives."
 {¶ 17} At trial, Tu disputed the accuracy of her demonstration for the police on the videotape. Tu testified that she had seen Collins hold Jaevon as she had demonstrated, but that Collins had not shaken the baby. Tu testified that she was tired when she appeared on the videotape, and that the officers had insisted to her that the baby had been shaken. Tu further testified that the police had led her into shaking the baby for the taped demonstration, but that she had never actually seen Collins shake the baby.
 {¶ 18} Tu did admit, however, that there were two incidents where Collins had become very upset when Jaevon cried. Tu testified that Collins had become so angry with the crying baby that he began yelling and throwing items and had to leave the apartment.
 {¶ 19} Tu also testified that she currently believed that either her 14-year-old niece or Collins's brother's girlfriend had injured Jaevon. Tu testified that her niece had been alone with the baby while she slept for a few hours on the Saturday and Sunday before Jaevon was brought to the hospital on Wednesday. And Tu testified that Collins's brother's girlfriend was usually at Collins's mother's home when the mother babysat for the children.
 {¶ 20} Officer Gehring testified that after interviewing Tu at the police station the morning after Jaevon was brought to the hospital, the officers interviewed Collins. According to Gehring, Collins was agitated when the officers began questioning him, and he became increasingly violent. Gehring testified that when they asked Collins if he had harmed Jaevon, he kicked the table. Later in the interview, when told he was going to be charged for harming Jaevon, Collins began punching and headbutting the walls.
 {¶ 21} Gehring testified that Collins first stated that he had very little contact with the children. Collins stated that he was usually out every night until 6:00 a.m., and that when Jaevon cried, he did not like to touch him because he did not want to spoil him. Gehring testified that Collins then changed his story and stated that he liked to pick Jaevon up when he cried and walk around the apartment while singing to him. Collins told him that, on one occasion, he had stepped on a piece of Lego block and had fallen down with Jaevon, and that Jaevon had hit the front of his head on a coffee table. Collins also stated that he would sometimes playfully hold Jaevon by the ribcage up over his head and lightly shake him back and forth while talking to him.
 {¶ 22} The state questioned Dr. DeGraw about the various explanations offered by Tu and Collins for Jaevon's injuries. Dr. DeGraw testified that Tu had told him about the time that she had fallen asleep and Jaevon had rolled onto the floor from the couch. He stated that that incident could not explain the baby's injuries. DeGraw testified that it was unlikely that a child would suffer a skull fracture from such a minor fall, though it was possible, and that the bleeding inside Jaevon's eyes and the leg fractures "absolutely don't come from that type of injury."
 {¶ 23} According to DeGraw, Tu had also told him about the time Collins fell and Jaevon's head hit the coffee table. Dr. DeGraw testified, "Again, skull fracture may be consistent with a simple straight fall against a sharp side of a table. The bleeding inside the skull, the bleeding in the eyes, and the fractures within his legs, absolutely not."
 {¶ 24} Dr. DeGraw continued, "Jaevon without a doubt suffered an impact injury. There's only one way to get a skull fracture, that's to have an impact to the skull, whether that's being slammed against something, being hit with something." DeGraw testified that Jaevon's other injuries, the bleeding in the skull, the bleeding behind the eyes, and the fractures of both his legs, indicated that Jaevon was most likely shaken or slammed against something. He also stated that the child's "bucket handle" leg fractures were very unusual and almost always seen in cases involving abuse.
 {¶ 25} DeGraw also testified that Jaevon had most likely sustained his injuries within 24 hours of when he was brought to the hospital. Dr. DeGraw testified that when Jaevon was initially brought to the hospital, it appeared that both of his leg fractures were healing. But, at trial, Dr. DeGraw stated that though the first radiologist thought there was some healing on the leg x-rays, two radiology specialists commonly used by the child-abuse team thought that the leg fractures were not healing. Therefore, Dr. DeGraw testified that it was his opinion that Jaevon's legs may have been broken during the same incident that had produced the brain trauma.
 {¶ 26} Based on the original information that Jaevon had both healing and acute injuries and appeared to have been abused on at least two separate occasions, Collins was indicted on two counts of endangering children and two counts of felonious assault. At the close of the state's presentation of evidence, Collins moved for a Crim.R. 29 acquittal on one count of endangering children and one count of felonious assault, based on the insufficiency of the evidence. The court granted the motion and stated that the remaining single count of endangering children and single count of felonious assault included all alleged injuries to Jaevon.
 Insufficiency and Manifest Weight {¶ 27} In his one assignment of error, Collins argues that there was insufficient evidence to support his convictions, and that his convictions were against the manifest weight of the evidence.
 {¶ 28} In criminal cases, the legal concepts of sufficiency of the evidence and weight of the evidence are distinct.[3]
A challenge to the sufficiency of the evidence attacks the adequacy of the evidence presented. Whether the evidence is legally sufficient to sustain a conviction is a question of law.[4] The relevant inquiry in a claim of insufficiency is whether any rational factfinder, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proved beyond a reasonable doubt.[5]
 {¶ 29} A challenge to the weight of the evidence attacks the credibility of the evidence presented.[6] When evaluating the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.[7] The discretionary power to reverse should be invoked only in exceptional cases "where the evidence weighs heavily against the conviction."[8]
 {¶ 30} Collins was convicted of endangering children and felonious assault. The endangering-children statute prohibits abuse of a child under eighteen years of age.[9] The felonious-assault statute states that no person shall knowingly cause serious physical harm to another.[10]
 {¶ 31} The state offered evidence that Jaevon had been abused and had suffered serious physical harm. He had two skull fractures, bleeding in his brain and the back of his eyes, and two fractured legs. The doctor testified that Jaevon's injuries were life-threatening, and that a majority of the children suffering injuries similar to Jaevon's would have vision problems, including total vision loss, and would have some sort of learning disability.
 {¶ 32} The state further offered evidence that Jaevon's crying had frustrated Collins, and that, on several occasions, Collins had gotten angry and thrown things, eventually leaving the apartment. Collins felt that Tu had spoiled Jaevon by giving him attention when he cried.
 {¶ 33} The state also presented evidence from Tu that Collins had shaken Jaevon twice, asking the baby why he was crying and saying the baby had no reason to keep crying. Tu demonstrated on videotape how she had seen Collins shake the baby. Several weeks later, she wrote in a letter to Collins that she had "only told the truth for our son" about what she had seen Collins do.
 {¶ 34} Finally, the state offered evidence that Jaevon's injuries were first noticed early on Wednesday morning, and that Collins had been the sole caretaker for Jaevon — for the first time ever — for the entire day on Monday and also for several hours on Tuesday.
 {¶ 35} We conclude that a rational factfinder, viewing the evidence in a light most favorable to the state, could have found that the state had proved beyond a reasonable doubt that Collins had committed the offenses of endangering children and felonious assault. Therefore, the evidence presented was legally sufficient to sustain Collins's convictions.
 {¶ 36} Despite Tu's statements to the police and her letter to Collins, Tu claimed at trial that she had been mistaken when she told the police that she had seen Collins shake the baby several times. She also testified that she believed that it was not Collins, but one of two other family members, who had harmed Jaevon. Given the conflicting accounts, the jury was free to believe some, all, or none of Tu's testimony. Our review of the record does not persuade us that the jury clearly lost its way or created a manifest miscarriage of justice in finding Collins guilty of endangering children and felonious assault. Therefore, the convictions were not against the manifest weight of the evidence.
 {¶ 37} Accordingly, we overrule Collins's assignment of error and affirm his convictions.
Judgment affirmed.
Doan, P.J., and Hildebrandt, J., concur.
[1] R.C. 2919.22(B)(1).
[2] R.C. 2903.11(A)(1).
[3] See State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52, 678 N.E.2d 541.
[4] Id.
[5] See State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus.
[6] See State v. Thompkins, supra, at 387.
[7] See id.; State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
[8] See State v. Martin, supra.
[9] R.C. 2919.22(B)(1).
[10] R.C. 2903.11(A)(1).